UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE )
COMPANY, JOHN HANCOCK )
VARIABLE LIFE INSURANCE )
COMPANY, and INVESTORS )
PARTNER LIFE INSURANCE )
COMPANY, )
        Plaintiffs, )
 )                        CIVIL ACTION NO.
        v. )                        03-12501-DPW
 )
ABBOTT LABORATORIES, )
        Defendant. )

MEMORANDUM AND ORDER
September 16, 2005

This declaratory judgment action turns on the question of whether plaintiffs John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and Investors Partner Life Insurance Company (collectively, "Hancock") remained obligated to make certain payments to defendant Abbott Laboratories ("Abbott") under a Research Funding Agreement ("Agreement") entered into by the parties on March 13, 2001. Litigation arose following Abbott's failure to demonstrate that it "intended and reasonably expected" to expend $▇▇▇▇▇▇▇ -- the "Aggregate Spending Target" set forth in the Agreement -- within the initial four-year term of the Agreement. Hancock argues that its obligations to make further payments to Abbott terminated with Abbott's failure to demonstrate its intention to

-1-

meet the Aggregate Spending Target by December 31, 2004.  Abbott
contends that under the terms of the Agreement it had five years
-- i.e., until December 31, 2005 -- in which to meet the
Aggregate Spending Target.  Abbott further contends that it
demonstrated that it "intended and reasonably expected" to meet
the Aggregate Spending Target within this permissible period,
and, therefore, that Hancock's funding obligation did not
terminate.  In response to the declaratory judgment action filed
by Hancock, Abbott counterclaimed for both breach of contract and
declaratory judgment, raising waiver and equitable estoppel
arguments.  Each party has now moved for summary judgment.

## I. BACKGROUND

### A.    Facts

1. Formation of the Agreement

     Although the parties now disagree as to who initiated the
matter, they both acknowledge that by the year 2000 they were
engaged in negotiations regarding an agreement by which they
would share the costs and potential benefits of Abbott's
development of certain new pharmaceutical compounds already in
the company's research and development pipeline.  The parties
contemplated Abbott contributing funds in a two-to-one ratio to
Hancock and then making specified milestone and royalty payments
to Hancock should any of the compounds be successfully
commercialized.  [Plaintiffs' 56.1 Statement ("P Stmnt.") at 4-5;
Defendant's 56.1 Statement ("D Stmnt.") at 2.]

     By the summer of 2000, the joint-funding structure under

-2-

discussion had assumed the following shape: (1) Hancock would
commit to providing approximately $▆▆▆▆▆ per year to Abbott
over a four-year period to help fund the research and development
of specified pharmaceutical compounds; (2) Abbott would spend at
least $▆▆▆▆▆ annually of its own funds on the development
of the compounds during this same period; (3) Abbott would spend
an aggregate minimum of approximately $▆▆▆▆▆ including the
funds provided by Hancock, on the research program over the
course of the four-year program term; and (4) if need be, Abbott
would be permitted to carryover its required annual spending from
year-to-year and its aggregate spending to a fifth year. [D
Stmnt. at 3-4; P Stmnt. at 5-6.]  The final "term sheet"
exchanged between the parties, dated June 27, 2000, provided that
Hancock's obligation to continue to make payments to Abbott would
cease if Abbott failed to "reasonably demonstrate, in its updated
research plan" the intent to spend the specified aggregate
amount. [D Stmnt. at 5; Affidavit of Kathleen B. Barry ("Barry
Aff."), Volume 1, Ex. 7.]

On August 17, 2000, Abbott sent Hancock an initial draft of
the Agreement.  In this draft, "Program Term" was defined as "a
period of four (4) Program Years," and "Program Year" was defined
as "a period of twelve (12) consecutive calendar months, with the
first Program Year commencing on , 2000 and each subsequent
Program Year commencing on the anniversary of such date." [Barry
Aff., Volume 1, Ex. 10 at 1.24, 1.25.]  Pursuant to this draft,
Abbott was required to expend $▆▆▆▆▆ defined as the

-3-

"Aggregate Spending Target," on Program Related Costs during the four-year Program Term. [Id. at 1.2, 3.2.] "Program Related Costs" were defined as:

> all direct and indirect costs and expenses which are spent by Abbott on the Research Program during a given Program Year including (i) any payments made by Abbott to John Hancock pursuant to Article 6; and (ii) any milestone and license fees paid by Abbott with respect to any Program Compound.

[Id. at 1.23.]

The August 17, 2000 draft provided mechanisms both for Abbott to change its funding obligations in certain defined ways and for the termination of Hancock's payment obligations. Specifically, § 3.3 of the draft, titled "Carryover Provisions," read as follows:

> Abbott shall be permitted to carryover its funding obligations under Section 3.2 as follows:
>
> (i) If in any Program Year Abbott spends on Program Related Costs, the Program Payments provided by John Hancock for such Research Year, but does not spend the full amount of the Annual Minimum Spending Target for such Program Year, Abbott agrees to spend the difference between its expenditure on Program Related Costs for such Program Year and the Annual Minimum Spending Target for such Program Year (the "Annual Carryover Amount") in the subsequent Program Year. John Hancock's obligation to make any program payment in such subsequent Program Year, pursuant to Section 3.1, shall be deferred until that time that Abbott notifies John Hancock that it has spent the Carryover Amount in such subsequent Program Year.
>
> (ii) If in each Program Year Abbott spends on Program Related Costs at least the Annual Minimum Spending Target but does not expend the full amount of the Aggregate Spending Target during the Program Term, Abbott agrees to expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs

-4-

> during the subsequent fiscal year commencing
> immediately after the end of the Program Term.    If
> Abbott does not spend the Aggregate Carryover Amount on
> Program Related Costs during such subsequent fiscal
> year, Abbott will refund to John Hancock one-third of
> the Aggregate Carryover Amount, which remains unspent
> by Abbott.

[Id. at 3.3.]

Section 3.4, titled "Termination of John Hancock's Program

Payments," provided that:

> Unless the parties agree upon an alternative arrangement, if
> Abbott: (i) ceases research and development of all Program
> Compounds during the Program Term; (ii) does not expend the
> Program Payment provided by John Hancock on Program Related
> Costs during any Program Year; (iii) does not reasonably
> demonstrate in its Annual Research Plan, its intent to
> expend Program Related Costs during the next Program Year in
> excess of the Program Payment provided by John Hancock for
> such year; or (iv) does not reasonably demonstrate, in its
> updated research plan, its intent to expend Program Related
> Costs during the Research Term[1] in excess of the Aggregate
> Spending Target, John Hancock's obligation to make any
> remaining Program Payments pursuant to Section 3.1 shall
> cease.  In case of either (i) or (ii) above, Abbott shall
> refund to John Hancock the Program Payment for such year
> minus half of the Program Related Costs actually spent by
> Abbott for that Program Year.

[Id. at 3.4.]

Among the numerous drafts of the Agreement exchanged by the

parties over the following months were two in November 2000 --

one dated November 16, 2000 and the other November 27, 2000 -- in

which the Program Term was lengthened to five years and could be

extended thereafter should specified regulatory events occur.

This revised structure was proposed by Hancock to compensate for

---

[1]During the negotiation period, the parties used the terms
"Research Term" and "Program Term" interchangeably.  [D Stmnt. at
9.]

Abbott having eliminated from the proposed "basket of compounds"
what Hancock characterized as "one of the more promising
compounds." [P Stmnt. at 7-8; D Stmnt. at 12-13.]

The November 16, 2000 draft was the first one to include
this alternative structure. The definitions section of the
November 16, 2001 draft contained a new term -- "Extension
Period" -- which was defined as "hav[ing] the meaning given in
Section 3.1." [Affidavit of Stephen J. Blewitt ("Blewitt Aff."),
Ex. 1 at 1.18.] Section 3.1, titled "John Hancock Program
Payments," set forth the schedule of payments by Hancock to
Abbott under the new, five-year Program Term and read in its
final sentence: "The number of days elapsed from (i) December 1,
2005 until (ii) the date on which Abbott receives such Regulatory
Approval [to market a product containing one or more of the
designated compounds], shall be hereinafter referred to as the
'Extension Period'" (emphasis in original). [Id. at 3.1.] The
draft contained a new definition of "Program Term," which was now
defined as "a period of five (5) consecutive Program Years[, as
extended by the Extension Period]." (alteration in original).
[Id. at 1.42.] "Program Year" was defined as "a period of twelve
(12) consecutive calendar months commencing on December 1 of each
year, except that the first Program Year shall commence on the
Execution Date and end on November 30, 2001." [Id. at 1.43.]
The "Aggregate Spending Target" was now $███████ [Id. at
1.3.], and "Program Related Costs" were defined as:

   (i) all direct and indirect costs and expenses that are

-6-

incurred by Abbott on the Research Program during a given
Program Year, and allocated in a manner consistent withe
Abbott's internal, pharmaceutical products division-wide
allocation procedures; and (ii) the milestone and license
feels paid during a given Program Year by Abbott to ▮▮▮▮
Co. . . . and to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Co. . . .

[Id. at 1.41.] In this draft, Section 3.3(ii) concerned Abbott's

ability to meet the Aggregate Spending Target in the "subsequent

year commencing immediately after the end of the Program Term" if

it failed to meet the target during the Program Term. [Id. at

3.3(ii).] Section 3.4 concerned the four circumstances that

would result in the termination of Hancock's "obligation to make

any remaining Program Payments." Both sections were marked as

"subject to change." [Id. at 3.4.]

The next draft of the Agreement, dated November 27, 2000,

also contemplated an initial Program Term of five years with an

extension period based on specified regulatory events. The

definition of "Program Term" in the November 27, 2000 draft

mirrored that in the November 16, 2000 draft, save for the

removal of the brackets around the words "as extended by the

Extension Period." [Compare Blewitt Aff. Ex. 1 at 1.42 with

Blewitt Aff. Ex. 2 at 1.44.] The definition of "Extension

Period," which was still explicated in § 3.1 regarding Hancock's

payment obligations, was modified such that it would commence on

December 31, 2005 rather than on December 1, 2005, as provided

for in the November 16, 2000 draft. [Compare Blewitt Aff., Ex. 2

at 3.1 with Blewitt Aff., Ex. 1 at 3.1.] This change was

apparently based on a re-definition of the term "Program Year" to

-7-

mean twelve consecutive calendar months starting on January 1 and running through December 31, save for the first Program Year which would commence on the Execution Date.[2]

The definition of "Program Related Costs" was modified by the addition of the words highlighted below:

> (i) all direct and indirect costs and expenses that are incurred by Abbott on the Research Program during a given Program Year, and allocated in a manner consistent with the Abbott's internal, pharmaceutical products division-wide allocation procedures; and (ii) the milestone and license feels paid during a given Program Year <u>or during any extension period of the Program Term</u> by Abbott to [ ] Co. Ltd. . . . and to [ ] Co., Ltd. . . .

(emphasis added) [Plaintiff Aff., Ex. 2 at 1.43.] Finally, the provision allowing for Abbott to meet the Aggregate Spending Target "during the subsequent year commencing immediately after the end of the Program Term" if it failed to do so by the end of the Program Term, <u>i.e.</u>, Section 3.3(ii) in the November 16 draft, was no longer marked "subject to change," and the section concerning the termination of Hancock's payment obligations, <u>i.e.</u>, § 3.4, was marked "Open for Discussion" rather than "subject to change."  [<u>Id.</u> at 3.3(b) and 3.4.]

---

[2]This modification in the definition of "Program Year" was hinted at in the November 27, 2000 draft and finalized in the January 23, 2001 draft.  The November 27, 2000 draft defined "Program Year" as "a period of twelve (12) consecutive calendar months commencing on December 1 of each year, except that the first Program Year shall commence on the Execution Date and end on December 31, 2001." [Blewitt Aff. Ex. 2 at 1.45.]  The January 23, 2001 draft defined "Program Year" as "a period of twelve (12) consecutive calendar months commencing on [] January 1 of each year, except that the first Program Year shall commence on the Execution Date and end on December 31, 2001." [Blewitt Aff. Ex. 3 at 1.46.]

-8-

By January 2001, Abbott had added a new compound to the
"basket of compounds" and the parties had reverted to the four-
year Program Term structure under previous discussion.  The next
draft of the Agreement was dated January 23, 2001.  In this
draft, Section 3.1, which addressed Hancock's payment
obligations, was revised to provide for four payments over the
course of four years.  The text from the prior draft regarding a
fifth Program Year, fifth and sixth program payments by Hancock,
and an "Extension Period" to the Program Term was crossed out.
[Blewitt Aff. Ex. 3 at 3.1.]  The definition of "Program Term"
was changed to read: "a period of four (4) consecutive Program
Years."  [Id. at 1.45.]  Although the phrase "Extension Period"
remained in the "Definitions" section of the January 23, 2001
draft -- still defined as "hav[ing] the meaning given in Section
3.1" [id. at 1.20.] -- as noted above, the text of § 3.1 that
provided a definition of "Extension Period" was deleted in this
draft.  [Id. at 3.1.]  The definition of "Program Related Costs"
was modified in the January 23, 2001 draft as indicated below:

> (i) all direct and indirect costs and expenses that are
> incurred by Abbott on the Research Program during a given
> Program Year, and allocated in a manner consistent withe
> Abbott's internal, pharmaceutical products division-wide
> allocation procedures; and (ii) the milestone and license
> feels paid during a given Program Year or during any
> extension period of the Program Term by Abbott to (a)
> Co. . . . (b)                                      Co. . . . , and (c) to
>                                          Kt. . . .

[Id. at 1.44.] (emphasis supplied).  Finally, the "Open for
Discussion" comment regarding Section 3.4, which set forth the
circumstances under which Hancock's payment obligation would

-9-

terminate, was crossed out in the January 23, 2001 draft.

On a March 8, 2001 draft of the Agreement, Hancock's counsel made handwritten revisions on March 8 and 9, 2001 indicating that the phrase "Extension Period" in the definitions section should be deleted because "this term is no longer used."  The revisions also proposed that the section where it appeared, § 1.19, read "[Intentionally Omitted.]"  [Blewitt Aff., Ex. 4 at 1.19.]  In this draft, the text regarding ████████████████████████████ Rt. that had been added to the definition of "Program Related Costs" in the January 23, 2001 draft was omitted.  The definition of this term was not otherwise changed.  [Id. at 1.43.]  "Program Term" was still defined as "a period of four (4) consecutive Program Years."  [Id. at 1.44.]  The "Carryover Provisions" of Section 3.3 were unchanged, as were the four scenarios in Section 3.4 whereby Hancock's payment obligation would terminate.  [Id. at 3.3 and 3.4.]

2. Terms of the Agreement

Following the negotiations discussed above, during which approximately forty (40) drafts of the Agreement were exchanged between the parties, Hancock and Abbott executed a final version of the Research Funding Agreement by and between Abbott and Hancock (the "Agreement") on March 13, 2001.  [See Barry Aff., Ex. 1 and Blewitt Aff., Ex. 5.]  The Agreement obligated both Hancock and Abbott to make certain expenditures in support of the Research Program, which was defined as:

all of Abbott's, its Affiliates' and Subcontractors'

-10-

> activities directed toward obtaining Regulatory Approval for
> the Products, including research, development, safety and
> efficacy studies, clinical trials, process development,
> formulation work, regulatory, quality, data collection and
> analysis and project management.

[Agreement, § 1.47.]  Pursuant to § 1.39 of the Agreement,

"Product" was defined to mean: "any product containing one or

more of the Program Compounds as an active ingredient, alone or

in combination with other active ingredients (including any

Bundled Product and any Combination Product)."  [Id., 1.39.]  The

Product Compounds consisted of ███ enumerated pharmaceutical

products that were either in clinical trials or in preclinical

development at the time the Agreement was executed.[3]

Under the terms of the Agreement, Hancock committed to

paying Abbott a total of $███████ -- divided into Program

Payments of $███████, $███████, $███████, and $███

███, respectively, for 2001, 2002, 2003, and 2004

(collectively, the "Program Years") -- in support of the Research

Program.  [Id., § 3.1.]  Abbott's funding obligation, on the

other hand, was bifurcated: during each Program Year, it was

required to spend on Program Related Costs at least the Annual

Minimum Target for that Program Year; it was also required during

the entire Program Term to spend at least the Aggregate Spending

Target on such costs.  [Id., § 3.2.]

---

[3] The Program Compounds, set forth in Exhibit 1.40 to the
Agreement, were ███████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

With respect to the duration-related terms used above,
"Program Year" was defined to mean "a period of twelve (12)
consecutive calendar months commencing on January 1 of each year,
except that the first Program Year shall commence on the
Execution Date [March 13, 2001] and end on December 31, 2001",
[Id., § 1.45], and "Program Term" was defined as "a period of
four (4) consecutive Program Years." [Id., § 1.44.]  With
respect to the spending terms, the following definitions applied:

> 'Program Related Costs' shall mean (i) all direct and
> indirect costs and expenses that are incurred by Abbott on
> the Research Program during a given Program Year and
> allocated in a manner consistent with Abbott's internal,
> pharmaceutical products division-wide allocation procedures;
> and (ii) the milestone and license feels paid during a given
> Program Year or during any extension period of the Program
> Term by Abbott to (a) ▇▇▇▇Co. Ltd. . . . and (b)
> ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇Co., Ltd. . . . .

[Id., § 1.43.]

> 'Annual Minimum Spending Target' for each Program Year,
> shall mean the sum of (i) the Program Payment of John
> Hancock for such Program Year as specified in Section 3.1,
> (ii) ▇▇▇▇▇▇▇▇▇Dollars ▇▇▇▇▇▇▇▇▇
> Annual Carryover Amount for the prior Program Year pursuant
> to Section 3.3.  With respect to the fifth Program Year, the
> 'Annual Minimum Spending Target' shall mean the Annual
> Carryover Amount for the prior Program Year pursuant to
> Section 3.3.

[Id., § 1.5.]

> 'Aggregate Spending Target' shall mean ▇▇▇▇▇▇▇
> ▇▇▇▇Dollars ▇▇▇▇▇▇▇.

[Id., § 1.3.]

As noted in the definition of "Annual Minimum Spending Target,"
the Agreement set forth mechanisms for Abbott to "carryover" its
funding obligations both for a given Program Year and for the

entire Program Term.  Specifically, Section 3.3, titled

"Carryover Provisions", provided that:

> Abbott shall be permitted to change its funding obligations
> under Section 3.2, only as follows:
>
> (a) If in any Program Year Abbott spends on Program Related
> Costs, the full amount of the Program Payment provided by
> John Hancock for such Program Year, but does not spend the
> full amount of the Annual Minimum Spending Target for such
> Program Year (including any Annual Carryover Amounts from
> any prior Program Years), Abbott will spend on Program
> Related Costs the difference between its expenditure on
> Program Related Costs for such Program Year and the Annual
> Minimum Spending Target for such Program Year (the '<u>Annual</u>
> <u>Carryover Amount</u>') in the subsequent Program Year.  John
> Hancock's obligation to make any Program Payment for such
> subsequent Program Year, if any, pursuant to Section 3.1,
> shall be deferred until the time that Abbott has spent and
> notifies John Hancock that it has spent the Annual Carryover
> Amount in such subsequent Program Year; and
>
> (b) If Abbott does not expend on Program Related Costs the
> full amount of the Aggregate Spending Target during the
> Program Term, Abbott will expend the difference between its
> expenditures for Program Related Costs during the Program
> Term and the Aggregate Spending Target (the '<u>Aggregate</u>
> <u>Carryover Amount</u>') on Program Related Costs during the
> subsequent year commencing immediately after the end of the
> Program Term.  If Abbott does not spend the Aggregate
> Carryover Amount on Program Related Costs during such
> subsequent year, Abbott will pay to John Hancock one-third
> of the Aggregate Carryover Amount that remains unspent by
> Abbott, within thirty (30) days after the end of such
> subsequent year.

(emphasis in original)

Thus, Abbott was permitted to carryover its annual spending from

one Program Year to the next Program Year and its aggregate

spending to the year subsequent to the end of the Program Term.

Returning to the section of the Agreement regarding Abbott's

funding obligation, the Agreement went on to provide that

Hancock's "sole and exclusive remedies for Abbott's failure to

fund the Research Program in accordance with this Section 3.2
(but not for any other breach of Abbott's other obligations
hereunder) are set forth in Sections 3.3 and 3.4." Hancock's
remedies under the "Carryover Provisions" of Section 3.3 are set
out above.  Section 3.4, titled "Termination of John Hancock's
Program Payment Obligation," provided, in relevant part, that:

> If Abbott: (i) abandons development of all Preclinical
> Programs and Program Compounds in any Program Year during
> the Program Term (it being understood that such abandonment
> need not occur entirely in one Program Year); (ii) does not
> expend on Program Related Costs during any Program Year the
> full amount of the Program Payment made by John Hancock for
> such Program Year; (iii) does not reasonably demonstrate in
> its Annual Research Plan, its intent and reasonable
> expectation to expend on Program Related Costs during the
> next Program Year an amount in excess of the Program Payment
> to be provided by John Hancock for such year; or (iv) does
> not reasonably demonstrate in its Annual Research Plan its
> intent and reasonable expectation to expend on Program
> Related Costs during the Program Term an amount in excess of
> the Aggregate Spending Target, John Hancock's obligation to
> make any remaining Program Payments for any succeeding
> Program Years pursuant to Section 3.1 shall terminate.  For
> the avoidance of doubt, the Program Payments for the Program
> Year in which such event occurs shall still be due and
> payable [...].

As noted above, these remedies and those set forth in § 3.3 of
the Agreement were delineated as the "sole and exclusive"
remedies for Hancock should Abbott fail to fund the Research
Program in accordance with the Agreement.  [Id., § 3.2.]

     Turning now to ongoing reporting requirements, Abbott was
required to provide Hancock with: (1) an Annual Research Plan[4]

_____

     [4]"Annual Research Plan" was defined in § 1.6 of the
Agreement as:

     for the Program Years in the Program Term, a reasonably and
     consistently detailed statement of the objectives,

("ARP"); and (2) a "reasonably detailed report setting forth the
status of the Research Program and all Program Related Costs
expended by Abbott during such Program Year . . . [s]uch report
shall also contain such other information related thereto as John
Hancock may reasonably request from time to time."  [<u>Id.</u>, §§ 2.2,
2.5.]  The first of these reporting requirements was addressed in
Section 2.2 of the Agreement, titled "Research Plan," which
provided, in its entirety, that:

> The Research Program shall be conducted by Abbott in each
> Program Year in accordance with the Annual Research Plan for
> such Program Year.  The Annual Research Plan will be
> provided to John Hancock until Abbott either abandons
> development in accordance with the terms hereof, or receives
> Regulatory Approval for, each Program Compound in the U.S.
> Territory, or some combination thereof.  The Annual Research
> Plan shall be prepared by Abbott and presented to John
> Hancock at least forty-five (45) days prior to the start of
> each Program Year.  The first Annual Research Plan is
> attached as <u>Exhibit 1.6</u>.  Abbott may modify the Annual
> Research Plan from time to time in order to best meet the
> objectives of the Research Program.  Any such modifications
> to the Annual Research Plan shall be promptly provided to
> John Hancock.  In addition, Abbott shall provide an Annual
> Research Plan for each year after the end of the Program
> Term as long as there is an active research program for any
> Program Compounds.

With respect to the latter reporting requirement (<u>i.e.</u>, the
annual status report), Abbott was to provide the report at least
thirty (30) days before the end of each Program Year, and was

_____

> activities, timetable and budget for the Research Program
> for every Program Year remaining in the Program Term, it
> being understood that less detail shall be required for
> Program Years that are not the current Program Year. . . .
> 'Annual Research Plan' shall mean, for those years occurring
> after the expiration of the Program Term, a reasonably and
> consistently detailed statement of the objectives,
> activities, timetable and budget for the Research Program
> for such year only.

permitted to include "good faith estimates" regarding the Program Related Costs for the final three (3) months of that Program Year, so long as the status report for the following Program Year included the actual Program Related Costs incurred during this time period. [Id., § 2.5.]

Article 6 of the Agreement required that Abbott make three management fee payments, each in the amount of $███████ to Hancock on December 1 of 2002, 2003, and 2004, as well as paying Hancock certain Milestone Payments, which ranged from $██████ to $███████. The Milestone Payments were contingent upon the progress of the development and regulatory approval of the Product Compounds. Article 7 of the Agreement set forth the parties' arrangements regarding the rates and terms of any royalty payments Abbott might be obligated to make to Hancock depending on the commercial success of the Product Compounds. As set forth in the definition of "Royalty Term" in § 1.50, Abbott's obligation to make royalty payments to Hancock shall terminate entirely on December 31, 2015.

For present purposes, only two additional terms of the Agreement need to be highlighted. First, § 16.3, titled "Entire Agreement," constituted an integration clause and provided that:

> [t]his Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by both parties hereto.

-16-

Second, in § 16.2 the parties stated that the Agreement would be
"governed by and construed in accordance with the internal laws
of the State of Illinois" but that Abbott consented to the
"exclusive jurisdiction of the courts of the Commonwealth of
Massachusetts and the United States District Court for the
District of Massachusetts" over any "suit, action, or other
proceeding" arising from the Agreement.

3. Performance by the Parties

      As noted above, the Agreement was executed on March 13,
2001.  The 2001 ARP was attached to the Agreement as Exhibit 1.6
and indicated that Abbott planned to spend over $███████████ on
Program Related Costs during the four-year Program Term. [Blewitt
Aff., Ex. 5.]  Subsequent to the execution of the Agreement,
responsibility at Abbott for both administering the Agreement and
providing Hancock with the ARPs and status reports required by
its terms, shifted from Bob Funk to Thomas Lyons ("Lyons"), whose
job title was Controller of Abbott's Global Pharmaceutical
Research and Development Division ("GPRD").[6] [P Stmnt. at 16.]
Before assuming the GPRD Controller job, Lyons had no prior
experience with the Agreement. [D Stmnt. at 19.]  Lyons did not
review the entire Agreement upon commencing the GPRD Controller

_____

      [5]As set forth in the 2001 ARP, projected spending on the
███ Program Compounds for 2001 through 2004 was
$███████████             See Ex. 1.6 to 2001 ARP.

      [6]Mr. Funk had served as the Global Pharmaceutical Research
and Development Division ("GPRD") Controller on a temporary basis
after Stephen Cohen, who previously held the position, left
Abbott in early 2001.

-17-

job and he did not recall whether his partial review included §
3.4, the provision titled "Termination of John Hancock's Program
Payment Obligation." [P Stmnt. at 16.]

     During the course of 2001, Abbott decided to halt
development of ███ of the Program Compounds -- ████████████
████ -- and provided Hancock with written notice of this decision.
[P Stmnt. at 17.]  In November 2001, Lyons sent what he termed
the "2002 Preliminary Annual Research Plan" ("2002 'Preliminary'
ARP") to Blewitt at Hancock.  [Blewitt Aff., Ex. 6.]  In the
cover letter accompanying the 2002 "Preliminary" ARP, Lyons asked
Blewitt to "note that the preliminary plan funding for the
program compounds is increasing $████████ over 2001 APU (April
Update)." [Id.]  Lyons continued, "[w]e are in the process of
finalizing our internal function costs and chargeable rates for
2002." [Id.]  The sum total of the 2001 through 2004 "Program
Spending by Year" for the ████ remaining compounds for which
data was provided in the 2002 "Preliminary" ARP was $████████
-- $████████ less than the total set forth in the 2001 ARP,
but well above the $████████ Aggregate Spending Target for the
Program Term.  Lyons sent Blewitt a "2001 Program Status Report
and Related Cost Summary" on December 18, 2001, which set forth
actual spending on the program, but he never provided Blewitt
with a revised or "final" 2001 ARP. [P Stmnt. at 17; D Stmnt. at
19.]

     The Agreement provided that the Payment Date for Hancock's
Program Payment to Abbott for the first Program Year -- the

-18-

amount of $███████ -- was December 1, 2001.  The Agreement
further provided, however, that if Hancock had not received both
the ARP and the status report for a particular program year at
least thirty (30) days prior to the Payment Date, its obligation
to make the Program Payment for that year "shall be suspended
until thirty (30) days have elapsed from the date of John
Hancock's receipt of both such Annual Research Plan and report."
[Agreement, § 3.1.]  Because Abbott did not provide the 2001
status report to Hancock until December 18, 2001, Hancock's
obligation to make its initial Program Payment was suspended
until January 17, 2002.  Hancock made the first Program Payment
on January 17, 2002. [P Stmnt. at 18.]

     On December 20, 2002, Lyons sent Blewitt both the 2002
Program Status Report with Related Costs and also what he termed
the "2003 Preliminary Annual Research Plan" ("2003 'Preliminary'
ARP").  [Blewitt Aff., Ex. 7.]  The 2002 status report indicated
that



[Id.]  For

the ██████████████████████████████ Program Compounds

still in development, the "2003 Preliminary Annual Research Plan"

listed planned spending only for 2003 and not for 2004,[7] the

fourth and final year of the Program Term, information that had

been included in the 2001 ARP and 2002 "Preliminary" ARPs.[8] [Id.]

The total planned spending on these ███ Program Compounds for

2003 was $████████████, a mere 37% of the $████████████ planned

spending for 2003 ($█████████████ without the since terminated

██████████) set forth in the 2002 "Preliminary ARP." [Id.; Blewitt

Aff., Ex. 6.]

    As in 2001, Hancock's obligation to make its second Program

Payment -- in the amount of $████████████ -- by the December 1,

2002 Payment Date set forth in the Agreement was suspended by

Abbott's failure to provide the 2003 ARP and 2002 status report

at least thirty (30) days in advance of the Payment Date.

Hancock's payment did not become due until January 19, 2003 -- a

Sunday -- thirty (30) days after its receipt of the above-

referenced documents.  Hancock made the second Program Payment,

_____

    [7]Abbott states, and Hancock does not dispute, that the 2003
"Preliminary" ARP was generated using an "interim system for
development planning . . . implemented by Abbott in 2002 as a
temporary measure, [that] lacked the capability to generate
automated reports of projected development spending for more than
a one-year period." [D Stmnt. at 20.]  The point is moot, though,
as the Agreement contains no exception for "technical
difficulties" of this sort in relation to the required contents
of the ARPs.

    [8]The 2001 ARP set forth "Projected Spending by Year" for
2000 through 2005, while the 2003 "Preliminary" ARP set forth
"Program Spending by Year" for 2001 through 2006.

the timeliness of which Abbott does not dispute, the next

business day, i.e., Monday, January 20, 2003.

       Upon first receiving the 2003 "Preliminary" ARP from Lyons

in December 2002, Blewitt did not observe that the document

contained planned spending information only for 2003 and not for

2004. [D Stmnt. at 20.]  In the course of further review of the

document,[9] however, Blewitt recognized the omission and in a

_____

       [9]Abbott makes much of the fact that Hancock's Chief Risk
Officer ("CRO") during this time period, John Mastromarino,
disapproved of the Agreement, which was executed before he
assumed the CRO position at Hancock.  It is undisputed that
Mastromarino commented to another Hancock employee that the
company "never would have done that transaction [i.e., the
Agreement] if he [Mastromarino] had been here at the time" and
stated in a March 14, 2003 e-mail regarding the Agreement that:

       I must say it is a bit too rich for my taste with too many
       assumptions and unknowns; and how would I ever explain
       should it not work out as predicted.  But even if I could
       get comfortable with the legitimacy of it all, the size of
       this deal is beyond my threshold, and certainly beyond the
       house limit for what is, at best, a B rated credit risk.
       All driven, no doubt, by our need to continually reach for
       yield to meet corporate ROE goals.

[Barry Aff., Ex. 20.]
Abbott points to Mastromarino's displeasure with the Agreement --
and subsequent calculations by Blewitt showing that Hancock's
rate of return on the investment had decreased and its risk of
losing its entire invested capital had increased since the
Agreement was executed -- as providing a motive for Hancock to
come up with a pretext for escaping its further funding
obligations under the Agreement and thereby increase its rate of
return.  [D Stmnt. at 21-26; Defendant's Memorandum in Support of
its Motion for Summary Judgment at 11-13.]  Absent a claim for
misrepresentation or bad faith on the part of Hancock -- of which
there is neither in this action -- the question for the court is
not why Hancock claims its further payment obligations under the
Agreement were terminated but, instead, whether this
interpretation is correct.  Thus, while the internal climate at
Hancock, generally -- and the disfavor in which the Agreement was
held, specifically -- may well have precipitated Blewitt's taking
a closer look at the 2003 "Preliminary" ARP and recognizing its

September 9, 2003 conference call with Lyons and other Abbott
personnel, asked Lyons both for a complete version of the 2003
ARP (<u>i.e.</u>, one containing the missing 2004 information), as well
as for information regarding what, as of 2002, Abbott estimated
it would spend on Program Related Costs in 2003 and 2004. [P
Stmnt. at 20; D Stmnt. at 25.]  In response to this request, on
September 22, 2003 Lyons sent Blewett what he termed the
"Portfolio Program and Development cost summaries for the Final
2003 Plan" ("2003 Final Plan"). [Blewitt Aff., Ex. 8.]  In a
cover letter to Blewitt prefacing the documents comprising the
2003 Final Plan, Lyons stated:

> Also, I went back to review the data and spend estimates
> made about 1 year ago for 2003.  On 8/26/02, the estimated
> program spend for 2003 was at $▮▮▮▮▮.  By October 14,
> 2002, after the Executive Committee's portfolio review, the
> estimated spend for 2003 had dropped to $▮▮▮▮ and for
> 2004, it was at $▮▮▮▮

[<u>Id.</u>]  The 2003 Final Plan indicated that Abbott planned to spend
$▮▮▮▮▮ on Program Related Costs through 2004 -- which was
less than the $▮▮▮▮▮ Aggregate Spending Target -- but to
expend an additional $▮▮▮▮▮▮ on such costs the following
year, bringing the total expenditure on Program Related Costs to
$▮▮▮▮ by the end of 2005. [P Stmnt. at 18; Defendant's
Response to P Stmnt. at 18; Blewitt Aff., Ex. 8.]

Following his receipt of the 2003 Final Plan, Blewitt sent

---

failure to set forth spending plans for 2004, the termination
provisions in § 3.4 of the Agreement do not require Hancock to
possess a particular state of mind in order to invoke them.  The
issue of Hancock's motive, therefore, is irrelevant for purposes
of this analysis.

Lyons a letter on October 10, 2003 that read, in relevant part:

> John Hancock has reviewed the information contained in your
> letter and the Final 2003 Plan, in conjunction with the more
> limited information contained in the Preliminary 2003 Annual
> Research Plan that Abbott supplied to John Hancock back in
> December 2002.  That review establishes, among other things,
> that Abbott's Annual Research Plan for the year 2003 did
> not, and does not, reasonably demonstrate Abbott's intent
> and reasonable expectation to expend on Program Related
> Costs during the Program Term an amount in excess of the
> Aggregate Spending Target, as defined in, and required
> under, the Funding Agreement.  Please be advised that, in
> light of these facts, John Hancock's obligation to make any
> remaining Program Payments to Abbott for the third and
> fourth Program Years is terminated pursuant to Section 3.4
> of the Funding Agreement.

[Blewitt Aff., Ex. 9.]  Thereafter, on November 12, 2003, James

Tyree ("Tyree"), the Vice President for Global Licensing/New

Business Development at Abbott, sent Blewitt a "preliminary

Annual Research Plan for 2004 and 2005" ("'Preliminary' 2004

ARP"), as well as a program status report for 2003 that included

data regarding actual Program Related Costs for the period from

October 1, 2002 through December 31, 2002.  The "Preliminary"

2004 ARP indicated that Abbott planned to expend only $██████

██████ on Program Related Costs through 2004 -- $█████████

short of the $██████████ Aggregate Spending Total -- and an

additional $██████████ in 2005, bring the total Program

Related Spending by the end of that year to $██████████.

[Blewitt Aff., Ex. 10.]

On November 26, 2003, Tyree sent Blewitt a letter stating

that Abbott had authorized a $████████ wire transfer to be made

to Hancock on December 1, 2003 as payment of the 2003 management

fee required under the terms of the Agreement. [Affidavit of

-23-

Karen Collari Troake, Ex. 22.]  Tyree went on in the letter to
state that:

> [w]ith the wire transfer, John Hancock will be in receipt of
> all requirements from Abbott for John Hancock to make its
> 2003 Program Payment of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [].
> These include the preliminary Annual Research Plan for 2004
> and 2005 required under Sections 1.6 and 2.2 of the
> Agreement, as well as the status report required by Section
> 2.5 of the Agreement, both of which were delivered to John
> Hancock on November 12, 2003.

[Id.]  Hancock did not make the $▓▓▓▓▓▓ Program Payment for
2003 and, instead, filed the present action on December 12, 2003.
[P Stmnt. at 21.]  The Payment Date for the $▓▓▓▓▓ Program
Payment for 2004 set forth in the Agreement was December 1, 2004.
[Agreement, § 3.1.]  To date, Hancock has not made the 2004
Program Payment.

**B.  Procedural History**

    Pursuant to 28 U.S.C. § 2201, Hancock commenced this action
on December 12, 2003, seeking a declaratory judgment from the
court both that its obligation to make additional payments to
Abbott had terminated in accordance with the terms of the
Agreement and that the Agreement otherwise remained in full force
and effect.  Abbott filed an answer and counterclaims on January
21, 2004, in which it contended that Hancock's payment
obligations had not been terminated and requested both a
declaratory judgment to the same effect as well as an award of
damages for alleged breach of contract by Hancock.  On May 12,
2004, I court granted the parties' joint motion for a protective
order and entered the proposed order.  Consistent with court

-24-

order, discovery concluded on August 20, 2004.  In the meantime,
on July 29, 2004 Hancock filed a motion to compel Abbott to
produce documents and provide substantive responses to certain
discovery requests.  Following an October 14, 2004 hearing on the
motion to compel, the parties were instructed to discuss
resolving the case as a "case stated" and report back to the
court regarding this possibility within two weeks' time.  In a
joint status report dated October 29, 2004, the parties indicated
that each agreed to resolution of the present action as a "case
stated."[10]  Pending before the court are motions for summary
judgment from Hancock and Abbott.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no

---

[10]In the joint status report Hancock explicitly agreed to
the "case stated" resolution proposal, but also articulated its
position that the "parties would benefit in the first instance
from the Court's guidance as to what potential factual disputes,
if any, the Court believes may exist based upon a preliminary
review of the summary judgment papers already on file."  Hancock
further requested that should the court -- following its
"preliminary review" of the summary judgment filings -- determine
that additional evidence regarding specific factual issues would
be useful in ruling upon the pending claims, the parties be given
two weeks to provide "additional written factual submissions
addressing such questions or issues, or, if appropriate, to
present live testimony at an abbreviated evidentiary hearing."
In the November 5, 2004 status conference, the parties agreed to
proceed as planned and to submit any additional filings within
two weeks.  I find the record before me adequate to resolve the
issues.

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). A fact is "material" if it has the "potential to affect

the outcome of the suit under the applicable law," Santiago-Ramos

v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.

2000) (internal citation omitted), and "[a] 'genuine' issue is

one supported by such evidence that a reasonable jury, drawing

favorable inferences, could resolve it in favor of the nonmoving

party." Triangle Trading Co. v. Robroy Industries, Inc., 200

F.3d 1, 2 (1st Cir. 1999) (internal citation omitted). When

deciding upon a motion for summary judgment, all facts are to be

viewed, and all inferences drawn, in the light most favorable to

the nonmoving party. Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st

Cir. 2002). On cross-motions for summary judgment, the court

"must consider each motion separately, drawing inferences against

each movant in turn." Id. at 17 n.5 (internal citation omitted).

A party seeking summary judgment must make a preliminary

showing that no genuine issue of material fact exists. Nat'l

Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.

1995), cert. denied, 515 U.S. 1103 (1995). Once the movant has

made such a showing, the nonmovant must point to specific facts

demonstrating that there is, indeed, a trialworthy issue. Id. A

genuine dispute of material fact cannot be established through

"conclusory allegations, improbable inferences, and unsupported

speculation" alone. Medina-Munoz v. R.J. Reynolds Tobacco Co.,

896 F.2d 5, 8 (1st Cir. 1990).  The nonmovant "may not rest upon
the mere allegations or denials of the [moving] party's
pleading," and instead "must set forth specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).
Additionally, if the nonmovant "fails to make a showing
sufficient to establish the existence of an element essential to
[its] case, and on which [it] will bear the burden of proof at
trial," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), then
summary judgment must be entered against the nonmovant.  With
respect to the nonmovant's burden of proof in establishing the
essential elements of its case, the resolution of a motion for
summary judgment "implicates the substantive evidentiary standard
of proof that would apply at a trial on the merits."  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## B. Contract Interpretation

### 1. Applicable Law

Before turning to the dispute between the parties regarding
their current obligations and entitlements under the Agreement,
it is necessary to set forth the general principles that will
guide this analysis.  First, as noted above in Section I.A.2.,
the parties stipulated in the Agreement that it be governed by
and construed in accordance with Illinois law.  Neither party
disputes this provision of the Agreement.  Absent a compelling
reason to do otherwise, and in accordance with standard practice

-27-

in the First Circuit, I will apply the substantive law of
Illinois in accordance with the parties' Agreement.  See Cochran
v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003)(finding it
"settled in this circuit that when the parties have reached a
plausible agreement about what law governs, a federal court
sitting in diversity jurisdiction is free to forgo independent
inquiry and accept that agreement.").

        Second, under Illinois law, as elsewhere, the primary
purpose in construing a contract is to "ascertain the intent of
the parties and give effect to that intent."  Eichengreen v.
Rollins, Inc., 325 Ill.App.3d 517, 521 (1st Dist. 2001) (citing
In re Marriage of Olsen, 124 Ill.2d 19, 25-26 (1988)); see also
Geier v. Hamer Enterprises, Inc., 226 Ill.App.3d 372, 389 (1st
Dist. 1992) ("In construing a contract, the primary objective is
to give effect to the intent of the parties at the time they
entered into the contract.").

        In determining the parties' intent, Illinois follows the so-
called "four corners" rule, an approach pursuant to which:

> '[a]n agreement, when reduced to writing, must be presumed
> to speak the intention of the parties who signed it.  It
> speaks for itself, and the intention with which it was
> executed must be determined from the language used.  It is
> not to be changed by extrinsic evidence.'

Air Safety, Inc. v. Teachers Realty Corp., 185 Ill.2d 457, 462
(1999) (quoting Western Illinois Oil Co. v. Thompson, 26 Ill.2d
287, 291 (1962)).  An exception exists, however, to this
prohibition against the introduction of extrinsic evidence in

-28-

determining the contracting parties' intent.  If the terms of an
alleged contract are ambiguous or capable of more than one
interpretation, . . . parol evidence is admissible to ascertain
the parties' intent."  Quake Construction, Inc. v. American
Airlines, Inc., 141 Ill.2d 281, 288 (1990).

The initial task, then, for a court construing a contract
under Illinois law is to determine whether the contract is
facially unambiguous, which is a question of law.  See Air
Safety, 185 Ill.App.2d at 462.  In answering this question, the
court is to bear in mind that the inability of the parties to
agree upon the meaning of the contract does not compel the
conclusion that the contract is ambiguous.  See City of Marshall
v. City of Casey, 177 Ill.App.3d 1065, 1071 (4th Dist. 1989).
Instead, a contract is only ambiguous when "the language used is
susceptible to more than one meaning or is obscure in meaning
through indefiniteness of expression."  Shields Pork Plus, Inc.
v. Swiss Valley Ag Service, 329 Ill.App.3d 305, 310 (4th Dist.
2002) (internal citations and quotations omitted); see also
Majchrowski v. Norwest Mortgage, Inc., 6 F.Supp.2d 946, 963 (N.D.
Ill. 1998) (applying Illinois law in holding that "[b]oth
parties' interpretive positions must be reasonable for the court
to find an ambiguity.").  When conducting this analysis, the
language of the contract being construed must be given its
"common and generally accepted meaning," Shields Pork Plus, 329
Ill.App.3d at 310, and the court "must consider the document as a

-29-

whole, rather than focusing upon isolated portions." <u>Premier</u>
<u>Tile Co. v. Donahue</u>, 328 Ill.App.3d 161, 164 (2nd Dist. 2002).

    If the court finds that the contract is unambiguous, the
contract is to be interpreted as a matter of law based upon the
contract language alone, and in a manner that is not contrary to
the "plain and obvious meaning of its terms." <u>Dean Management,</u>
<u>Inc. v. TBS Construction, Inc.</u>, 339 Ill.App.3d 263, 269 (2nd
Dist. 2003); <u>see also</u> <u>Kallman v. Radioshack Corp.</u>, 315 F.3d 731,
735-36 (7th Cir. 2002) (noting that "interpretation of the terms
of an unambiguous contract is traditionally a question of law and
is particularly suited to disposition on summary judgment" and
holding that "[u]nder Illinois law, we give clear and unambiguous
contract terms their plain meaning."). If, however, the court
finds that the contract is ambiguous, parol evidence may be
considered by the court in ascertaining the intent of the
parties. <u>See, e.g.</u>, <u>Quake Construction</u>, 141 Ill.2d at 288;
<u>Shields Pork Plus</u>, 329 Ill.App.3d at 311.

    One final guiding principle set forth by the Illinois
Supreme Court directs the present analysis: "It is fundamental in
contract construction that, if possible, effect must be given to
all of the language so that provisions which appear to be
conflicting or inconsistent may be reconciled or harmonized." <u>In</u>
<u>re Halas</u>, 104 Ill.2d 83, 92 (1984); <u>see also</u> <u>Kimball Hill</u>
<u>Management v. Roper</u>, 314 Ill.App.3d 975, 980 (2nd Dist. 2000)
(holding that "[a] contract must be read in its entirety and

-30-

effect given to each of its provisions.").

2. Construing the Agreement

    Both parties argue in the first instance that the terms of
the Agreement are unambiguous and support the particular
interpretation the party advances.  Abbott and Hancock agree that
§ 3.4(iv) of the Agreement provides that Hancock's obligation to
make Program Payments to Abbott "for any succeeding Program
Years" is terminated if Abbot "does not reasonably demonstrate in
its Annual Research Plan its intent and reasonable expectation to
expend on Program Related Costs during the Program Term an amount
in excess of the Aggregate Spending Target."  [Agreement, § 3.4.]
From this common starting point, however, the parties reach
dramatically different conclusions regarding the meaning of this
clause.

    Hancock contends that, given the definitions elsewhere in
the Agreement of the capitalized terms deployed in § 3.4(iv), the
section is subject to only one reasonable interpretation, namely
that "Abbott was required to demonstrate, in each ARP that it
provided to John Hancock prior to each Program Year during the
Program Term, that it then intended and reasonably expected to
expend at least $            on Program Related Costs during a
Program Term that consisted of the period from March 13, 2001 to
December 31, 2004."  [Plaintiff's Memorandum of Law in Support of
Motion for Summary Judgment ("P MSJ") at 6.]  Abbott, by
contrast, points to the "extension period of the Program Term"

-31-

language in the definition of Program Related Costs in § 1.43(b)
and to the fact that Abbott had an unqualified right under the
"Carryover Provisions" of § 3.3 of the Agreement to reach the
Aggregate Spending Target in the "subsequent year commencing
immediately after the end of the Program Term," to argue that "it
is clear the parties intended that Abbott's exercise of its right
to spend the $▓▓▓▓▓▓▓ aggregate over five years would operate
to extend the Program Term under Section 3.4(iv), so that
Abbott's obligation to <u>forecast</u> its intent to spend the aggregate
is coincident with the time period over which Abbott is <u>actually</u>
<u>permitted</u> to spend it." [Defendant's Memorandum in Support of its
Motion for Summary Judgment ("D MSJ") at 17 (emphasis in
original).]

For the reasons set forth below, I find that the Agreement,
save for two terms discussed below, is unambiguous and that the
interpretation proffered by Hancock is the only reasonable one.

A brief review of the relevant terms of the Agreement, which
are set forth in detail in Section I.A.2 <u>supra</u>, is necessary.
Under the terms of the Agreement, Hancock was obligated to
provide Abbott with approximately $▓▓▓▓▓▓ per year (the
"Program Payments") over a four-year period spanning from 2001
through 2004 (the "Program Term"), to fund the research and
development of certain pharmaceutical compounds (the "Research
Program").  Abbott was obligated during each of these four

-32-

Program Years to meet an "Annual Minimum Spending Target" for the
Research Program consisting of the aforementioned monies
contributed by Hancock, plus an additional $            of its own
funds.  Furthermore, over the course of the four-year Program
Term, Abbott was required to expend a total of $            on
the Research Program (the "Aggregate Spending Target").  The
Agreement contained a mechanism in § 3.3 for Abbott to "change its
funding obligations" and thereby carryover its required Annual
Minimum Spending Target from one Program Year to the next Program
Year, as well as to carryover the Aggregate Spending Target to
the "the subsequent year commencing immediately after the end of
the Program Term."  In the very next section, the Agreement
detailed four scenarios under which Hancock's duty to provide
Program Payments to Abbott would be terminated.  The fourth and
final such scenario provided that Hancock's obligation to make
any remaining Program Payments "shall terminate" if Abbott "does
not reasonably demonstrate in its Annual Research Plan its intent
and reasonable expectation to expend on Program Related Costs
during the Program Term an amount in excess of the Aggregate
Spending Target."

    Having reviewed the relevant terms of the Agreement, I turn
now to how they were put into practice.  Abbott's first Annual
Research Plan ("ARP"), the one for 2001, was attached to the
executed Agreement as an exhibit.  In this ARP, Abbott projected
that it would spend more than $            on the Research

Program between 2001 and 2004.  Thus, the $███████ Aggregate

Spending Target set forth in the Agreement was approximately 50%

of the amount Abbott represented to Hancock it expected to spend

on the Research Program over the four-year Program Term -- a

differential presumably designed to allow sufficient room for any

necessary funding adjustments during the term of the Agreement

that might stem from the vagaries of the pharmaceutical

development process.  The 2002 ARP provided to Hancock by Abbott

projected Research Program spending of $███████ over the

course of the Program Term -- less than the $███████

initially projected, but still well in excess of the $███████

Aggregate Spending Target.  The first ARP for 2003 that Abbott

sent to Hancock, which it termed a "Preliminary Annual Research

Plan" included projected spending data only for 2003 and not for

2004.  The total projected spending through 2003 was less than

$███████ and without the 2004 projections, this ARP

necessarily failed to demonstrate on its face that Abbott

"intended and reasonably expected" to spend at least the $███

███████ Aggregate Spending Target by the end of the four-year

Program Term.  In September 2003, at the request of Hancock,

Abbott provided additional information about its planned Research

Program Spending for 2003 and 2004.  This supplementary

documentation revealed that Abbott expected to spend only $███

███████ on the Research Program through 2004, but an additional

$███████ in the following year, 2005, bringing the total

projected spending through 2005 to $███████████.  Two months
later, in November 2003, Abbott forwarded another "Preliminary"
ARP to Hancock, this one for 2004, in which the company's planned
spending through 2004 had fallen still farther, to $██████
██████.  This APR projected additional spending of $█████
████ in 2005, for a grand total of $████████████ to be spent
on the Research Program by the end of that year.

From the foregoing facts, none of which are in dispute, it
is patently clear that as of December 2002, Abbott failed to
demonstrate to Hancock its "intent and reasonable expectation" to
expend the $███████████ Aggregate Spending Target on Program
Related Costs by the end of 2004.  These undisputed facts would
seem to compel the conclusion that under the plain meaning of the
Agreement terms, Hancock was thereby relieved of any obligation
to make Program Payments to Abbott for 2003 and 2004.  Abbott
resists this interpretation on the ground that because the
definition of Program Related Costs -- a term explicitly
referenced both in § 3.3, which concerns Abbott's right to
"carryover" Research Program expenditures, and § 3.4, which
concerns the termination of Hancock's funding obligations, of the
Agreement -- included a reference to "any extension period of the
Program Term," the parties intended Abbott's option to meet the
Aggregate Spending Target in five years to have the effect of
extending the four-year Program Term to five years.  As a result,
Abbott argues, so long as it demonstrated its intent to meet the
Aggregate Spending Target by the end of the extended, five-year

-35-

Program Term, Hancock was not relieved of its obligation to make additional Program Payments.  This proposed construction fails on several fronts.

First, the Agreement defines "Program Term" specifically and without exception as "a period of four (4) consecutive Program Years."  The phrase "Program Year" is defined as "a period of twelve (12) consecutive calendar months commencing on January 1 of each year, except that the first Program Year shall commence on the Execution Date [March 13, 2001] and end on December 31, 2001."  Thus, the Program Term, as defined by the Agreement, ran from March 13, 2001 through December 31, 2004.

This is not to say that the parties contemplated either the Research Program or their financial partnership ending at the end of four years -- in fact, much of the benefit each expected to realize from the partnership would not come until years later when, it was hoped, some of the designated pharmaceutical compounds would be successfully brought to market.  The Agreement explicitly contemplated Program Years taking place after the expiration of the four-year Program Term; for example, the definition of "Annual Research Plan" differentiated between the content these plans must include in the course of the Program Term, when they were required to provide information for all remaining years of the Program Term, and thereafter, when they need only speak to the current Program Year.  Although the research and development of the Program Compounds, and the reporting on these efforts, would continue after the four-year

-36-

Program Term ended, it was only during the Program Term -- and possibly during a fifth Program Year if Abbott did not expend the Aggregate Spending Target within four years -- that the parties had particular funding obligations for the Research Program.[11]

Second, although the Agreement allowed Abbott some flexibility in meeting both its annual and aggregate spending obligations, this carryover option did not affect the duration of the Program Term. The "Carryover Provisions" in § 3.3 of the Agreement make no mention of any extension of the Program Term. Instead, § 3.3(b), which addresses the ability of Abbott to "carryover" its funding obligations with respect to the Aggregate Spending Target, provides that "[i]f Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend" this deficit -- the so-called "Aggregate Carryover Amount" -- "during the subsequent year commencing immediately after the end of the Program Term." (emphasis added) The grammatical structure suggests that the provision was a contingency clause requiring Abbott to meet the Aggregate Spending Target in a fifth year if, by the end of the four-year Program Term, it had failed to do so.

---

[11]In fact, the Aggregate Spending Target carryover provisions contained three references to the time period after the end of the Program Term: (1) "the subsequent year commencing immediately after the end of the Program Term," (2) "such subsequent year," and (3) "such subsequent year." See also the definition of "Annual Minimum Spending Target" in Section 1.5, which refers to the "fifth Program Year." It is clear, however, that these references to the fifth or subsequent Program Year contemplate the year after the four year Program Term.

Hancock agrees with this interpretation, arguing that the
"subsequent year . . . after the end of the Program Term" during
which Abbott was permitted to meet the Aggregate Spending Target
could not logically be within an extended "Program Term" and
therefore the carryover provisions do not serve to extend the
Program Term.  Abbott refers to this argument as "pure
sophistry."  Given the slender supports upon which Abbott erects
its proposed contract interpretation, it should be wary of
casting such aspersions.  Certainly, if the Agreement otherwise
provided for the extension of the "Program Term," the "subsequent
year . . . after the end of the Program Term" language could
reasonably be interpreted, as Abbott suggests, as referring to
the end of the initial four-year Program Term.  However, in the
absence of any mechanism for the extension of the Program Term
under the terms of the Agreement -- as opposed to the extension
of the deadline by which Abbott was required to meet the
Aggregate Spending Target -- Hancock is well advised to highlight
this language.

The carryover provisions in § 3.3 are silent with respect to
Abbott's planning, as opposed to spending, obligations, and set
forth neither a specific mechanism whereby Abbott was to notify
Hancock of its intention to carryover the Aggregate Spending
Target to a fifth year, nor a specific time period during which
Abbott was required to make this determination.[12]

_____

[12]The carryover provisions with respect to the Aggregate
Spending Target do, however, specify a penalty should Abbott fail

Third, the only reference to an "extension period of the Program Term" in the thirty-four (34) page Agreement comes in an irrelevant subpart of the definition of "Program Related Costs." [Agreement, § 1.43(b).]  Abbott argues unconvincingly that by incorporating this phrase into Sections 3.3(b) and 3.4(iv), the Agreement "explicitly contemplates a potential extension of the Program Term." [Defendant's Memorandum in Opposition to P MSJ at 7.]

Turning first to the language of the Agreement, I note that the "extension period" language does not appear in the first part of the definition, which provides that "'Program Related Costs' shall mean (i) all direct and indirect costs and expenses that are incurred by Abbott on the Research Program during a given Program Year . . .," but only in the second, which reads, in pertinent part, "(ii) the milestone and license fees paid during a given Program Year or any extension period of the Program Term by Abbott."  Abbott does not explain the absence in subpart (i) of these seven words upon which it relies so heavily.  More importantly, it is difficult to determine what time period, exactly, subpart (ii) refers to.  After all, the Program Term -- whether four years, as asserted by Hancock, or Abbott's extended, five year alternative -- would seem to be subsumed within the

---

to meet the target in the "subsequent year commencing immediately after the end of the Program Term."  To wit, if Abbott failed to meet the target during "such subsequent year," it was to "pay to John Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days of the end of such subsequent year."  [Agreement, § 3.3(b).]

-39-

reference to Program Years because the Program Years continue to
run even after the expiration of the Program Term under either
interpretation.  The phrase, therefore, would seem to be
redundant.

Hancock maintains that the "extension period of the Program
Term" language contained in the definition of "Program Related
Costs" is a vestige of an alternative structure briefly
considered by the parties during the negotiation of the
Agreement.  Although I find Hancock's vestige argument more
persuasive given the parol evidence discussed below, I find that
there is a manner, albeit not necessarily the most reasonable
one,  in which this language could be interpreted consistent with
Hancock's argument that the Program Term was fixed and would not
be changed by Abbott exercising its carryover right -- i.e., as
referring to the time period after the end of the Program Term ,
which might be less than a year, during which Abbott would
continue spending to reach the Aggregate Spending Target leftover
from the fourth Program Year.  In any event, because this
language in the definition of "Program Related Costs" is
"susceptible to more than one meaning or is obscure in meaning
through indefiniteness of expression," Shields Pork Plus, 329
Ill.App.3d at 310 (internal citations and quotations omitted), I
find that this portion of the contract to be ambiguous and,
therefore, will consider parol evidence in order to ascertain the
intent of the parties.  See, e.g., id. at 311; Quake

-40-

Construction, Inc., 141 Ill.2d at 288.  When conducting this

analysis, I bear in mind that:

> preliminary negotiations between the parties may be
> considered in order to determine their meaning and intention
> and to ascertain in what sense the parties themselves used
> the ambiguous terms in the writing which sets forth their
> contract.  If the previous negotiations make it manifest in
> what sense they understood and used those terms, they
> furnish the best definition to be applied in the
> construction of the contract itself.

Rybicki v. Anesthesia & Analgesia Assoc., Ltd., 246 Ill. App. 3d

290, 299-300 (4th Dist. 1993) (quoting 17A Am. Jur. 2d Contracts

§ 403, at 429-30 (1991)).

In turning to the extrinsic evidence, the first order of

business is to clarify a point of confusion that arose during the

February 16, 2005 summary judgment hearing.  The argument was

pressed during the hearing that in the portion of the definition

of "Program Related Costs" in section 1.43(ii) reading "the

milestone and license fees paid during a given Program Year or

during any extension period of the Program Term by Abbott to . .

.," the words "by Abbott" modified the phrase "any extension

period of the Program Term."  Upon further review, however, it is

clear that "by Abbott" modifies the phrase "the milestone and

license fees paid."  This interpretation is consistent with the

structure of the first portion of the definition in Section

1.43(i) - which reads "all direct and indirect costs and expenses

that are incurred by Abbott on the Research Program during a

given Program Year" (emphasis supplied) -- and is necessary in

order to give the clause a reasonable interpretation.  After all,

-41-

if "by Abbott" did not modify "the milestone and license fees paid," then such fees paid by third parties to the designated recipients would count as "Program Related Costs" for purposes of the Agreement, surely an unreasonable outcome. The drafting history of the Agreement also supports this interpretation. The parallel portions of the definition of "Program Related Costs" in the August 17, 2000 and November 16, 2000 drafts of the Agreement read, respectively, "any milestone and license fees paid by Abbott with respect to any Program Compound," and "the milestone and license fees paid during a given Program Year by Abbott to [designated recipients]" (emphasis supplied). In the next draft, which was dated November 27, 2000, the phrase "or during any extension period to the Program Term" was inserted between "the milestone and license fees paid during a given Program Year" and "by Abbott to." The resulting sentence structure is inelegant, but does not serve to change the meaning of the clause. The words "by Abbott" continue to modify "the milestone and license fees paid."

I turn now to the inserted phrase -- "or during any extension period of the Program Term" -- one Abbott accords great weight in making the argument that it could unilaterally extend the Program Term from four to five years by exercising its right under the Carryover Provision to meet the Aggregate Spending Target in a fifth Program Year. As noted above, this phrase constitutes the sole reference in the Agreement to an "extension period of the Program Term." The words were added to the

-42-

Agreement in the November 27, 2000 draft, which was produced in the course of the parties' negotiations regarding an alternative structure proposed by Hancock. Pursuant to this alternative structure, the initial Program Term was five years and thereafter could be extended by an "Extension Period," which was explicitly defined as the period between the end of the five-year Program Term on December 31, 2005 and the date on which Abbott received regulatory approval from the FDA to market a product containing one or more of the Program Compounds as an active ingredient in the U.S.

In the November 16, 2000 draft, the first one reflecting the proposed alternative structure, "Extension Period" was included as a defined term in the "Definitions" section. Its definition referred the reader to Section 3.1 for the precise meaning of the phrase. The definition of "Program Term" in this draft read "a period of five (5) consecutive Program Years[, as extended by the Extension Period]" (alteration in original). "Extension Period" also appeared as a defined term in the November 27, 2000 draft, a draft in which the modification to the definition of "Program Term" suggested in the November 16, 2000 draft was finalized. As noted above, the November 16, 2000 draft was the first version in which the definition of "Program Related Costs" was modified to include the phrase "or during any extension period of the Program Term" after the text "the milestone and license fees paid [by

-43-

Abbott] during a given Program Year."[13]

By the next draft of the Agreement, which was dated January 23, 2001, the parties had abandoned the proposed alternative structure.  Accordingly, the definition of Program Term was changed back to read "a period of four (4) consecutive Program Years," and all references to a fifth Program Year in the original Program Term and to an "Extension Period" of the Program Term thereafter were deleted from § 3.1, which, as noted above, is where the definition of "Extension Period" was set forth. Apparently due to an oversight, "Extension Period" was still listed in the "Definitions" section of the January 23, 2001 draft, but the definition provided -- "'Extension Period' shall have the meaning given in Section 3.1" -- had been rendered meaningless by the deletion of the relevant text from § 3.1.  The only other reference to an "extension period" of the Program Term that survived in the January 23, 2001 draft was the one now at issue, which was buried within the definition of "Program Related Costs."

In reviewing the March 8, 2001 draft of the Agreement, counsel for Hancock recognized that "Extension Period" should be deleted from the "Definitions" section of the Agreement, as the parties had since abandoned the alternative structure to which it

---

[13]The phrase would appear to be redundant boilerplate.  The time period referenced would be included, after all, within one or more of the aforementioned Program Years.  Perhaps it was added based on the misunderstanding that Program Years were only those years included within the initial Program Term.

applied.  Accordingly, counsel made a handwritten notation next
to "Extension Period" in the "Definitions" section reading "this
term is no longer used."  The line was marked for deletion and
the text "[Intentionally Omitted.]" was to be substituted.  In
this round of revisions, the reference to an "extension period of
the Program Term" contained in the definition of "Program Related
Costs" once again escaped notice and was not marked for deletion.

    In the final version of the Agreement, which was dated March
13, 2001, the line in the "Definitions" section where "Extension
Period" had previously appeared read "[Intentionally Omitted.]";
"Program Term" was defined as "a period of four (4) consecutive
Program Years; and the only reference to an "extension period of
the Program Term" was the one contained in the definition of
"Program Related Costs."

    The drafting history demonstrates that the reference to an
"extension period of the Program Term" was added to the
definition of "Program Related Costs" while the parties were
negotiating an alternative structure under which "Extension
Period" was a defined term with a precise meaning, i.e., the
period between the end of the then-contemplated five-year Program
Term and the occurrence of certain regulatory events.  The
carryover provision by which Abbott argues it could extend the
Program Term to five years under the final Agreement pre-dated
the insertion of this phrase and, notably, makes no reference --
by the words "extension period", "Extension Period" or otherwise
-- to any extension of the Program Term.  Once the parties

-45-

returned to a four-year Program Term structure, all other
references to the "Extension Period," including the one contained
in the definition of Program Term, were deleted through several
rounds of edits.  The drafting history suggests, therefore, that
the phrase was added in the course of and in light of the
parties' negotiations about the alternative structure proposed by
Hancock, and survived the return to the four-year Program Term
structure only on account of an editing oversight.

     The weight of the evidence regarding the negotiations
between the parties prior to their entering the Agreement, as
well as their post-ratification understandings of the Agreement,
do not subvert Hancock's vestige argument as Abbott contends.
The materials Abbott highlighted during the summary judgment
hearing can be understood in a manner consistent with Hancock's
reading of the Agreement and the drafting history.

     Abbott focused attention on the fact that the first ARP,
which was Exhibit 1.6 to the Agreement, included reference to
projected spending for 2005, the year following the end of the
original four-year Program Term.  Abbott failed to mention the
fact that the first ARP also listed projected spending for 2000,
the year prior to the commencement of the Program Term.  The
appearance, therefore, of projected spending for 2005 in the
first ARP carries no weight in assessing whether the parties
intended for Abbott to be able to extend the Program Term to five
years by exercising its carryover rights.

     The only documentary evidence linking the "Carryover

-46-

Provisions" of the Agreement with the extension of the Program
Term is a September 18, 2000 memorandum drafted by Choate, Hall &
Stewart, then counsel to Hancock.  The memo read, in relevant
part: "<u>Extension of Term</u>.  If the Research Program is extended
(for instance, of Abbott's expenditures are 'carried over' in
accordance with section 3.3(ii)), we believe that the Royalty
Term should be extended beyond December 31, 2014." [Barry Aff.,
Ex. 11 at 3.].  Hancock argues in response that this memo "raised
questions about the meaning and operation of the very first draft
of the parties' agreement" and "is hardly relevant to the
construction of the as-executed Agreement, which came six months
and many drafts later." [Plaintiffs' Memorandum of Law in
Opposition to D MSJ at 16.]  While not a wholly satisfactory
explanation, Hancock's hands are tied, to a certain extent, by
the failure of the attorney who drafted the memo to recollect
what, exactly, he meant by this sentence.  In any event, this
document cannot overcome the weight of the extrinsic evidence
pointing to the conclusion that the Program Term was fixed at
four years and was not extended by Abbott's exercising its right
to meet the Aggregate Spending Target in the "subsequent year
commencing immediately after the end of the Program Term."

     Abbott went on to point to two internal Hancock documents
authored by Stephen Blewitt, the point person at Hancock for the
Agreement.  The documents, dated March 27, 2003 and June 30,
2003, and thereby post-formation/pre-litigation, each included
the following text, which Abbott highlighted during the hearing:

"The commitment requires funding over a four-year period (with a potential extension to five years) beginning December 2001 and is subject to Abbott co-funding at least two times our commitment during the same period." [Barry Aff., Ex. 13; Barry Aff., Ex. 14.] Abbott argues that these documents indicate that "Hancock repeatedly interpreted the Agreement in its internal documents as permitting Abbott to extend its funding obligations into a fifth year." As discussed supra, Hancock does not dispute that Abbott, pursuant to the carryover provisions of the Agreement, could meet the Aggregate Spending Target in a fifth Program Year that would commence immediately after the end of the four-year Program Term. This carryover option is not equivalent to, and the text providing for it makes no reference to, an option to extend the Program Term beyond four years. Furthermore, the opportunity for Abbott to have a fifth year in which to meet the $█████ Aggregate Spending Target, should it fail to do so within four years, is not inconsistent with a requirement that it plan to spend the amount in four years. It is this distinction between planning and spending that gives the planning prong of the Agreement some weight. Abbott was required to plan to spend the amount within four years but, appreciating that circumstances might change, was given the flexibility to spend it in a fifth year should it fall short of the target at the end of the four-year Program Term.

Accordingly, I find that the "extension period of the Program Term" language contained in the definition of "Program

-48-

Related Costs" is a vestige.  This isolated phrase cannot function to disrupt the overall meaning of the contract by imbuing Abbott through the "Carryover Provisions" of § 3.3 with the unilateral power to extend the Program Term from four to five years, thereby relieving Abbott of its obligation to demonstrate its intention to meet the Aggregate Spending Target within the four-year Program Term.

        Finally, Abbott contends that Hancock's proposed interpretation of the Agreement "makes no commercial sense" as it "results in an economically irrational windfall for [Hancock], and a corresponding irrational forfeiture for Abbott." [D MSJ at 18-21.]  In arguing the "commercial unreasonableness" point, both parties cite XCO International Inc. v. Pacific Scientific Co., 369 F.3d 998 (7th Cir. 2004), which involved the application of Illinois law to a contract dispute.  Writing for the court in XCO, Judge Posner explained that "[c]ontract interpretations that produce commercially unreasonable results are disfavored, not as a matter of policy, but simply because they are implausible to impute to the parties." Id. at 1005.  In the next sentence, however, he qualified this interpretive stance as follows: "This principle of interpretation must be used cautiously because there is always a danger that what seems commercially unreasonable to a court did not seem so to the parties." Id.  That is the case here.

        Abbott uses the following hypothetical result, which it claims is the logical outcome of Hancock's proposed contract

interpretation, to demonstrate the "commercial unreasonableness"
of Hancock's interpretation: If Abbott were to estimate within
the initial four-year Program Term that it would spend
$█████████ on the Research Program during the Program Term --
i.e., $1,000 less than the Aggregate Spending Target -- and an
additional $█████████ in the fifth year, for a grand total of
$█████████ over the five year period, Hancock would no longer
be obligated to make further Program Payments to Abbott but would
be entitled to receive the benefit of its bargain (i.e., the
milestone and royalty payments).  Abbott cries foul at Hancock's
being relieved of all of its subsequent obligations under the
Agreement, while retaining all of its bargained for benefits,
"simply because Abbott forecasted it would spend $1,000 of its
required funding during the 'permitted' fifth year." [D MSJ at
19.]  There is a certain seductiveness to this reductive
argument, but upon closer examination -- and with Judge Posner's
cautionary words in mind -- the allure quickly fades.

Again, the words of the Agreement are the touchstone.  In
the ARP for each Program Year, Abbott was required to demonstrate
its intention and reasonable expectation to meet the Aggregate
Spending Target within the four-year Program Term.  Based on
Abbott's initial projected spending of $█████████ during this
period, which dwarfed the $█████████ Aggregate Spending Target,
this must have seemed both a reasonable and an achievable
requirement at the time the parties executed the Agreement.
Evidencing a certain prudence and a recognition that

circumstances could change, the parties provided Abbott with an
escape hatch of sorts -- namely, the ability to make up any
difference between the amount it had expended by the end of the
four-year Program Term and the Aggregate Spending Target.  This
could be done next year, i.e., the fifth Program Year.  But in
providing Abbott with this carryover option, the parties did not
relieve Abbott of its obligation to plan to spend the entire $▮▮

▮▮▮▮▮▮ Aggregate Spending Target by December 31, 2004.  In other
words, Abbott was not free to decide on March 14, 2001 that it
would spend only the Annual Minimum Spending Target during the
next three years and then "make up" the difference between that
amount and the Aggregate Spending Target in 2005.  As set forth
clearly in § 3.4 of the Agreement, in order for Hancock's payment
obligations to continue, Abbott needed to plan to meet the
Aggregate Spending Target by December 31, 2004.  If, during 2004,
Abbott found that it would not be able to meet the Aggregate
Spending Target during that year, it had the option under § 3.3
to bridge the gap during 2005 without risking the forfeiture of
future payments from Hancock as a result.

     While the incentive structure thus created by the parties is
vulnerable to critique -- in order to avoid forfeiting future
payments from Hancock, Abbott might be forced to allocate funds
in an inefficient manner so as to enter the final year of the
Program Term planning to meet the Aggregate Spending Target by
the end of that year -- this does not render the Agreement
"commercially unreasonable" or an "absurd result" requiring the

-51-

court to cast aside the literal interpretation of its terms.  See
McMahon v. Chicago Mercantile Exchange, 221 Ill.App.3d 935, 946
(1st Dist. 1991) (quoting 4 S. Williston, Williston on Contracts
§ 610B at 533 (3d ed. 1961), for the proposition that "language,
though seemingly plain and clear, will not bear a literal
interpretation if this leads to an absurd result.").  At the time
of formation, the parties could have modified the definition of
Program Term to read "four (4) consecutive Program Years[, and a
fifth year should Abbott exercise its carryover rights under
Section 3.3(b).]"  Alternatively, the text of § 3.4(iv) could
have been changed to provide that Abbott demonstrate in the ARPs
its "intent and reasonable expectation to spend on Program
Related Costs during the Program Term[, and the following year,
should Abbott need to exercise its carryover rights under §
3.3(b),] an amount in excess of the Aggregate Spending Target."
I will not inject this saving language into either the definition
of "Program Term" or into § 3.4, because "a presumption exists in
Illinois 'against provisions that easily could have been included
in the contract but were not. . . .  A court will not add a term
about which an agreement is silent.'"  Shields Pork Plus, 329
Ill.App.3d at 312 (quoting Klemp v. Hergott Group, Inc., 267
Ill.App.3d 574, 581 (1994)).  Abbott's frustration at failing to
address in advance the contingency it now faces will not serve to
rewrite this contract and it is bound by the terms it negotiated
with Hancock.

3. Payment for the Third Program Year (2003)

It is clear from the above discussion that Abbott failed to provide Hancock with a 2003 Annual Research Plan that demonstrated "its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target."  It remains to be determined, however, when Hancock's right to terminate payment for "any succeeding Program Years" crystallized and whether the year in which Abbott failed to demonstrate "its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target" ought to be 2002 or 2003.

Fixing the year of the obligation-terminating event determines whether or not Abbott is entitled to the $█████████ Program Payment by Hancock for 2003. [Agreement, §3.1.] As the relevant portion of § 3.4 makes clear,[14] Hancock is obligated to make the Program Payment for the year in which the triggering event occurs.  If the triggering event occurred in 2002, then Hancock has fulfilled its Program Payment obligations under the Agreement, but if the triggering event occurred in 2003, then Abbott is correct in its counterclaim that Hancock remains obligated to pay Abbott the $███████ Program Payment for 2003.

Hancock argues that "[b]ecause the ARP that Abbott provided

---

[14]§ 3.4 of the Agreement provides, "[f]or the avoidance of doubt, [that] the Program Payments for the Program Year in which such event occurs shall still be due and payable[.]"

-53-

to John Hancock in December 2002 (prior to commencement of the third Program Year) indisputably failed to demonstrate Abbott's intent and reasonable expectation to expend $614 million on Program Related Costs during the Program Term, John Hancock had no obligation to make Program Payments for ... the third and fourth Program Years." [P MSJ at 12.] Hancock's position, therefore, is that its payment obligations terminated "automatically" upon the receipt of the non-compliant ARP in December 2002. [Transcript of the February 16, 2005 Hearing ("Transcript") at 80.]  Abbott, on the other hand, argues that it is entitled to Hancock's $      2003 payment in Count I of its Counterclaim, "[e]ven assuming, arguendo, that Hancock's interpretation of the Agreement [is] correct," because it submitted its updated 2003 ARP on September 22, 2003.  [P MSJ at 27; Plaintiff's Opposition to D SJM at 20.] Abbott's attempt to sever this argument from the waiver and estoppel arguments, discussed in Section II.B.4 below, is presumably based on the premise that the submission of a "Preliminary" and incomplete ARP cannot trigger the termination mechanism in § 3.4(iv); only the submission of a complete ARP that updates the projected spending for the whole Program Term can trigger Hancock's right under § 3.4(iv).

To determine the correct result, I must discern the meaning of the triggering clause in § 3.4(iv), which reads if Abbott

"does not reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during the Program Term an amount in excess of the Aggregate Spending Target. . . ."  I find that this term is ambiguous because "the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression."  Shields Pork Plus, 329 Ill.App.3d at 310. Unfortunately, the parties have provided little argument or parol evidence to support their respective positions on the proper interpretation of this clause.  I am left, therefore, with the Illinois Supreme Court's guiding principle that "[i]t is fundamental in contract construction that, if possible, effect must be given to all of the language so that provisions which appear to be conflicting or inconsistent may be reconciled or harmonized."  In re Halas, 104 Ill.2d at 92.

    The purpose of § 3.4(iv) was to allow Hancock to terminate its future payment obligations, as it has done, should circumstances arise where Abbott has to decrease its projected spending on the Program Compounds for the remainder of the Program Term.  The termination would be triggered upon Hancock's receipt of a 2003 ARP that projected Abbott would not spend at least $          on the Program Compounds in 2003 and 2004.  As Hancock's counsel put it in oral argument: "Hancock did not want Abbott to be in a position to turn around and say, 'Oops, oh, did we say that in our Annual Research Plan?  We didn't mean that.

-55-

Here is what the data is.  Let me give you another Annual
Research Plan that now demonstrates what we actually intend to
spend and therefore now your obligation has somehow reignited.'"
[Transcript at 79.]

     Abbott's distinction between the Preliminary and Updated
ARPs for 2003 may be translated into a contractual interpretation
argument in light of the purpose of § 3.4(iv) as follows.
Section 3.4(iv) of the Agreement is triggered when Abbott submits
an Annual Research Plan during the Program Term that projects
spending for the remainder of the Program Term and the projected
spending fails to meet the Aggregate Spending Target.  The
"Preliminary" 2003 ARP submitted in December 2002 was only
preliminary and did not contain any projections for 2004.  As a
result, the "Preliminary" 2003 ARP cannot be treated as an Annual
Research Plan within the meaning of §§ 3.4(iv) and 1.6.  The only
document that meets the definition in § 1.6 is the "Updated" 2003
ARP submitted in September 2003.  Thus, it is only the "Updated"
2003 ARP that triggers the obligation-terminating event in §
3.4(iv), namely Abbott's failure to project that it will spend
$            by the end of 2004.

     On the other hand, the parties intended that the ARP for
2003 would be delivered to Hancock in anticipation of 2003 so
that Abbott could provide Hancock with its projected spending for
2003 and 2004.  The difficulty with the anticipatory element of
this alternative interpretation is that the Agreement fails --
and the parties have failed -- to address timeliness issues

-56-

clearly with respect to the deadline for the demonstration
required by § 3.4(iv).[15]  However, forced with making a decision,
I find that the obligation-triggering event based on these facts
was Abbott's failure to reasonably demonstrate in an Annual
Research Plan <u>for 2003</u>, "its intent and reasonable expectation to
expend on Program Related Costs during the Program Term an amount
in excess of the Aggregate Spending Target." [Agreement §
3.4(iv).]  I underline "for 2003" because it is clear from the
definition of ARP in § 1.6[16] and the instructions in § 2.2[17] that
the parties intended Abbott to present an ARP prior to the start
of each Program Year that would include detailed objectives and
the projected activities, timetables and budgets for the

_____

[15]The problems associated with timeliness requirements were
highlighted in oral argument.  The only relevant provisions that
refer to a time requirement for reporting are § 2.2, which
requires Abbott to submit its 2003 ARP "at least forty-five (45)
days prior to the start of" 2003, and § 3.1, which permits
Hancock to delay its payment date until thirty (30) have elapsed
from the date [it] receives Abbott's ARP and Research Report.
Given this loose construction, Hancock does not rely on the
lateness of a compliant ARP for 2003 as a ground to terminate its
payment obligations, just on Abbott's failure to demonstrate as
required by § 3.4(iv).  [Transcript at 76.]  Both counsel seem to
agree that lateness in delivering an ARP only triggers Hancock's
suspension right in § 3.1.  Thus, there appears to be no specific
deadline in the Agreement for the submission of a compliant ARP.

[16]§ 1.6 stipulates that an ARP shall mean "a reasonably and
consistently detailed statement of the objectives, activities,
timetable and budget for the Research Program for every Program
Year remaining in the Program Term[.]"

[17]§ 2.2 of the Agreement instructs in part that "[t]he
Annual Research Plan shall be prepared by Abbott and presented to
John Hancock at least forty-five (45) days prior to the start of
each Program Year."

-57-

remaining Program Years in the Program Term.  Thus, the parties
intended that the ARP for 2003 would be submitted to Hancock in
2002 and it would include detailed objectives and the projected
activities, timetables and budgets for 2003 and 2004.  As a
result, Abbott's failure to provide Hancock with a compliant ARP
for 2003 occurred in 2002.  This is the most reasonable
conclusion, despite the inherent problems associated with
timeliness in the Agreement, that gives effect to the Agreement
as a whole and the "intent of the parties at the time they
entered into the contract," Geier, 226 Ill.App.3d at 389.

    While the distinction raised by Abbott on this issue is
tempting, it is an argument that attempts to obtain two Program
Payments (2002 and 2003) for the price of one payment obligation
termination.  As a result, I find that the most reasonable
interpretation yields the conclusion that the obligation-
terminating event at issue -- Abbott's failure to demonstrate to
Hancock its intent and reasonable expectation to expend at least
the remaining Aggregate Spending Target in 2003 and 2004 -- took
place in 2002, not 2003.  That Abbott did not actually provide
deficient projections for 2004 until 2003, does not entitle it to
receive an additional year's Program Payment from Hancock.[18]

_____

    [18]During oral argument the parties also briefly considered
the question whether Abbott had any right to "cure" the deficient
ARP and the impact such a right would have on Hancock's right to
terminate its 2003 and 2004 payment obligations according to
§3.4(iv) of the Agreement.  I agree with Hancock that Abbott's
failure to deliver a compliant ARP for 2003 is not a curable
breach of contract as a result of either §11.2 of the Agreement

4. Abbott's Waiver and Estoppel Arguments

Abbott contends that Hancock waived and is equitably
estopped from objecting to the failure by Abbott to include 2004
spending projections in the "Preliminary" 2003 ARP sent to
Hancock in December 2002 by dint of Hancock's having made its
2002 Program Payment after the receipt of this allegedly
deficient ARP.  Neither argument, which I shall address in turn,
is availing.

Abbott grounds its waiver argument in the following
syllogism: (1) Hancock received the "Preliminary" 2003 ARP --
which, as Abbott admits, did not contain spending projections
beyond 2003 -- from Abbott in December 2002; (2) Hancock made its
2002 Program Payment in January 2003; (3) by making the 2002
Program Payment after receipt of the "Preliminary" 2003 ARP
Hancock "waived any ability to object or to withhold future

_____

or the common law remedy of cure.  Section 11.2, titled
Termination; Material Breach, states that:

> [i]t is the parties' express intent that consideration shall
> be given to remedying any breach of this Agreement through
> the payment of monetary damages or such other legal or
> equitable remedies as shall be appropriate under the
> circumstances and that there shall only be a limited right
> to terminate this Agreement under the following
> circumstances.

Section 11.2(b) stipulates that Hancock may only terminate "this
Agreement" as a result of Abbott's failure to abide by the terms
of this Agreement and a ruling by a court in accordance with the
procedures in §16.2.  In this case, Hancock has not brought an
action for breach of contract and has not asked that the court
terminate the Agreement.  Rather, Hancock is seeking a
declaratory judgment that its interpretation of the Agreement
terms is correct and thus its payment obligations are terminated
while the Agreement otherwise remains in full force and effect.

-59-

payments based on" alleged deficiencies in this ARP.  For
additional support for this argument, Abbott looks to § 3.1 of
the Agreement, pursuant to which if Hancock had not received the
2003 ARP and the 2002 status report at least thirty (30) days
prior to the Payment Date for 2002, which was December 1, 2002,
the obligation for Hancock to make its 2002 Program Payment was
suspended until thirty (30) days after its receipt of these
documents.  As is undisputed, in accordance with § 3.1, Hancock
did not make its 2002 Program Payment until January 20, 2003,
thirty (30) days after it received the "Preliminary" 2003 ARP
from Abbott.

       Abbott contends that because Hancock's obligation to make
its 2002 Program Payment was "'suspended' under Section 3.1 until
Abbott provided compliant reports," by making the 2002 Program
Payment after receiving the deficient "Preliminary" 2003 ARP,
Hancock "acknowledged, by its conduct, that it would not demand
strict compliance with the provision of the Agreement defining
the content of an ARP for 2003."  [Defendant's Memorandum in
Opposition to P MSJ at 17-18.]  The text of § 3.4 of the
Agreement, pursuant to which Hancock's further payment
obligations to Abbott were terminated based on the deficient ARP,
deals this argument a fatal blow.  In relevant part, § 3.4 reads
as follows:

       If Abbott: . . . (iv) does not reasonably demonstrate in its
       Annual Research Plan its intent and reasonable expectation
       to expend on Program Related Costs during the Program Term
       an amount in excess of the Aggregate Spending Target, John
       Hancock's obligation to make any remaining Program Payments

-60-

for any succeeding Program Years pursuant to Section 3.1
shall terminate.  For the avoidance of doubt, the Program
Payments for the Program Year in which such event occurs
shall still be due and payable [...].

Under the plain meaning of this section, Hancock remained
obligated to make the Program Payment to Abbott for 2002 because
2002 was the year in which "such event" -- namely the failure of
Abbott to "reasonably demonstrate in its Annual Research Plan its
intent and reasonable expectation to expend on Program Related
Costs during the Program Term an amount in excess of the
Aggregate Spending Target" -- occurred.  [See Section II.B.3.]
In fact, had Hancock not made the 2002 Program Payment after
receiving the deficient 2003 APR in December 2002, Abbott would
have had a cause of action against it for breach of contract.
Hancock making this payment, therefore, did not constitute the
"voluntary relinquishment of a known right, claim, or privilege,"
Vaughn v. Speaker, 126 Ill.2d 150, 161 (1988), necessary in order
for waiver to be found.  See also Wagner Excello Foods, Inc. v.
Fearn International, Inc., 235 Ill.App.3d 224, 232 (1st Dist.
1992) ("waiver is an intentional relinquishment of a known
right"); Whalen v. K-Mart Corp., 166 Ill.App.3d 339, 343 (1st
Dist. 1988) (same).

Under the terms of the Agreement, the following is clear.
First, and as discussed at length supra in Section II.B.2,
Hancock's obligation to make "any remaining Program Payments for
any succeeding Program Years" [i.e., 2003 and 2004] was
terminated, pursuant to § 3.4(iv) of the Agreement, by Abbott's

failure to "reasonably demonstrate" in the "Preliminary" 2003 APR
its "intent and reasonable expectation to expend on Program
Related Costs during the Program Term an amount in excess of the
Aggregate Spending Target."  Second, although this obligation-
terminating event took place in the 2002 Program Year, Hancock
was still obligated under the explicit mandate of § 3.4 -- "[f]or
the avoidance of doubt, the Program Payments for the Program Year
in which such event [the failure to provide a sufficient ARP]
occurs shall still be due and payable" -- to make the 2002
Program Payment to Abbott.  Third, that Hancock made this payment
in January 2003 -- thirty (30) days, pursuant to the "suspension"
provision of § 3.1, after it received the deficient "Preliminary"
2003 ARP -- is not "conduct indicating that strict compliance
with the provision [§ 3.4(iv)] will not be required," thereby
establishing waiver.  Geier v. Hamer Enterprises, Inc., 226
Ill.App.3d 372, 390 (1st Dist. 1992).  Fourth, even if Hancock
waived its right to suspend payment pursuant to § 3.1 until it
received a compliant Annual Research Report for 2003 from Abbott,
by doing so it did not also thereby waive its rights under § 3.4.
Section 16.8 of the Agreement, titled "Waiver" provided that:

> The waiver by either party hereto of any right hereunder or
> the failure to perform or of a breach by the other party
> shall not be deemed a waiver of any other right hereunder or
> any other breach or failure by said other party whether of
> similar nature or otherwise.

By making the 2002 Program Payment, therefore, Hancock cannot be
said to have intentionally relinquished a "known and existing
right," id., and thereby somehow revived its terminated payment

obligation.

Finally, I turn to the contention by Abbott that Hancock is equitably estopped from terminating its payment obligations because of deficiencies with the "Preliminary" 2003 ARP.

The Illinois Supreme Court has set forth both the definition of equitable estoppel and the six specific elements a party claiming it must establish.

> Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse.

> To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representation if the other person is permitted to deny the truth thereof.

Geddes v. Mill Creek Country Club, Inc., 196 Ill.2d 302, 313-14 (2001) (internal citations omitted).

Having asserted equitable estoppel as an affirmative defense to Hancock's case, Abbott bears the burden of proof on this claim. Accordingly, in order to survive Hancock's motion for summary judgment, Abbott must make "a showing sufficient" to establish the existence of the essential elements of the claim. Celotex Corp., 477 U.S. at 322. In pointing to what it terms a

-63-

"total lack of effort" on the part of Hancock to show that it is entitled, as a matter of law, to prevail over this defense, Abbott both misapprehends the operative burdens and mischaracterizes Hancock's pleadings.

In its memorandum in support of its motion for summary judgment, Hancock explains in detail why its payment to Abbott in January 2003 of the 2002 Program Payment -- the very act that Abbott contends "led Abbott to believe that the plan was acceptable to Hancock" -- was required under the terms of the Agreement despite the termination of its payment obligations for future Program Years (i.e., 2003 and 2004). Hancock thereby rebuts the argument by Abbott that in making the 2002 Program Payment in January 2003, after its receipt of the "Preliminary" 2003 ARP, Hancock somehow "misrepresented" to or "concealed material facts" from Abbott regarding the "acceptability" of the ARP. Without this predicate misrepresentation or concealment, Abbott's equitable estoppel defense withers on the vine. For its part, Abbott has failed to make a showing sufficient to establish the existence of essential elements of its equitable estoppel claim, the most important of which being the aforementioned misrepresentation or concealment, and, as a result, this affirmative defense cannot survive summary judgment.

Accordingly, I find that under the clear and unambiguous terms of the Agreement, supplemented by parol evidence to resolve the ambiguous language in the definition of Program Related

-64-

Costs, Hancock's obligation to make the Program Payments for 2003
and 2004 terminated when Abbott failed to demonstrate its
"intention and reasonable expectation" to meet the $█████████
Aggregate Spending Target within the four-year Program Term in
its ARP for 2003.  The Agreement otherwise remains in full force
and effect.

### III. CONCLUSION

For the reasons set forth more fully above, the motion for
summary judgment by Hancock is GRANTED and the motion for summary
judgment by Abbott is DENIED.


/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE